## CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

I, Joshua George, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, a position I have held since 2023. As such, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.      I am currently assigned to the Grand Rapids Office in the ATF Detroit Field Division where I am tasked with investigating violations of firearms and narcotics laws. Before working for the ATF, I was a certified police officer in the state of Tennessee for approximately six years. During my career in law enforcement, I have been involved in numerous investigations related to violations of federal criminal statutes, including those involving violations related to narcotics and firearms.

4.      The statements contained in this application are based on my personal observations, my training and experience, my review of relevant records related to this investigation, and information obtained from other agents and witnesses.

5.      Because I submit this application for the limited purpose of establishing probable cause to support the issuance of search warrant for the Subject Devices, I have not included each and every fact known to me concerning the investigation. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.      Based on the information outlined below, I submit that there is probable cause to believe that the crime of Felon in Possession of a Firearm Title 18, United States Code, Section 922 (g) (1). ("Subject Offenses"), took place in Muskegon County, in the Western District of Michigan. I further submit that this application establishes that there is probable cause to believe that the Subject Devices contain evidence of the commission of the Subject Offense.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is a (a) Blue Motorola Smartphone with a black protective case, hereinafter referred to as the "Subject Device."  The Device is currently being held by detectives with the Muskegon Major Crimes Initiative (MMCI) in Muskegon, Michigan.

8. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. May 29, 2026, Michigan State Police (MSP) Troopers conducted a traffic stop on a vehicle for illegal window tint. Upon making contact with the occupants of the vehicle, DAVIS was identified as the driver of the vehicle. The passenger in the vehicle was identified as Archie PETTY.

10. DAVIS advised MSP that the vehicle belonged to his girlfriend, and that he does not possess a valid driver's license. MSP opened the driver door to hand DAVIS his identification, and a bag containing multiple white pills fell to the pavement. DAVIS was asked to step out of the vehicle.

11. MSP checked a pill identifier reference, and determine that the pills were likely Hydrocodone. PETTY was then asked to exit the vehicle. MSP searched the vehicle and found a reusable grocery bag under the front center console. Inside the bag was a Glock 19 pistol with obliterated serial numbers.

12. Two cell phones were recovered from the vehicle. PETTY gave MSP consent to search his phone. No text messages were found discussing firearms, and no pictures of firearms were located. DAVIS did not give consent to search the Subject Device. The Subject Device was seized.

13.     I queried a law enforcement database and determined that DAVIS has the following convictions prohibiting him from possessing a firearm:

    a.  1996 – Felony Controlled Substance

    b.  2011 – Felony Weapons-Firearms-Possession by Felon

    c.  2020 – Felony Operating-While Intoxicated/Impaired

    d.  2020 – (2) Counts Felony Controlled Substance

    e.  2024 – Misdemeanor Domestic Violence

14.     In my training and experience, and conversations with other law enforcement officers, I know that individuals who possess firearms often take pictures of themselves and others with firearms. Further, those involved in firearms transactions will often take photos of firearms they intend to acquire or sell. These pictures are frequently stored on cellular telephones, computers, tablets, and other electronic storage devices.

15.     Based on my training and experience, and conversations with other law enforcement officers, I also know that it is common for individuals who commit crimes with others to use cellular telephones to store names, numbers, and contact information of other subjects with whom they are involved in these types of crimes. Cellular telephones are used to communicate with co-conspirators, accomplices, and others with knowledge of the criminal activity. Cellular telephones are likely to reveal the prior contacts called, messages and calls received from the contacts, the names and telephone numbers of contacts, messages to and from co-conspirators photographs of fruits of illegal activity, and photographs of those involved in any

scheme. In this respect, cellular telephones are tools commonly used during criminal episodes.

## TECHNICAL TERMS

16.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of a device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of

the addresses or locations involved in such navigation. The Global

Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR

satellites orbiting the Earth. Each satellite contains an 107 extremely

accurate clock. Each satellite repeatedly transmits by radio a mathematical

representation of the current time, combined with a special sequence of

numbers. These signals are sent by radio, using specifications that are

publicly available. A GPS antenna on Earth can receive those signals. When

a GPS antenna receives signals from at least four satellites, a computer

connected to that antenna can mathematically calculate the antenna's

latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA: A personal digital assistant, or PDA, is a handheld

electronic device used for storing data (such as names, addresses,

appointments, or notes) and utilizing computer programs. Some PDAs also

function as wireless communication devices and are used to access the

Internet and send and receive e-mail. PDAs usually include a memory card or

other removable storage media for storing data and a keyboard and/or touch

screen for entering data. Removable storage media include various types of

flash memory cards or miniature hard drives. This removable storage media

can store any digital data. Most PDAs run computer software, giving them

many of the same capabilities as personal computers. For example, PDA

users can work with word-processing documents, spreadsheets, and

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

17.    Based on my training and experience, I believe that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on the Subject Devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

19.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a cellular telephone was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Devices because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Subject Devices to human inspection in order to determine whether it is evidence described by the warrant.

21.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

22.    *Biometric Unlocking.* The warrant I am applying for would permit ATF agents or other law enforcement authorities to compel DAVIS to unlock a device subject to seizure pursuant to this warrant using the device's biometric features. I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features including fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these

biometric features, and the user of such devices can select which features they would like to utilize. I further know from my training and experience that biometrics can also be used to open individual mobile applications or computer programs on the phones, computers, or other electronic devices that are being searched. Many applications and computer programs require a password or biometric data to open them even after the phone or computer is unlocked. There are multiple applications such as social media or messaging applications which may utilize biometrics. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device, applications, or programs through his or her fingerprints. For example, I know from my training and experience, as well as from information found in publicly available materials, that most recent models of devices offer their users the ability to unlock the device via the use of fingerprint or thumbprint (together, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID. I also know that these models offer some of their users the ability to unlock the device via the use of facial recognition (through infrared and visible light scans) in lieu of a numeric or alphanumeric passcode or password.

b.      If a user enables a biometric lock using fingerprints on a given device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor. If a

user enables a facial biometric lock on a given device, he or she can unlock the device by raising the phone to his or her face or tapping the screen. In my training and experience, users of devices that offer these features often enable them because they are considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.

23.    Accordingly, I request that the Court authorize law enforcement personnel executing the warrant to press or swipe the fingers (including thumbs) of DAVIS to the fingerprint sensors of any applicable electronic device, if necessary, and/or with reasonable force hold her face in place while holding the device in front of her face, if necessary, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

24.    Law enforcement personnel executing the warrant will select which fingers to press to the device. The proposed warrant does not authorize law enforcement personnel to compel DAVIS to state or otherwise provide the password or passcode or any other means that may be used to unlock or access any device. Moreover, the proposed warrant does not authorize law enforcement personnel executing the warrant to compel DAVIS to identify the specific biometric characteristics (including unique fingerprint(s) or other physical features) that may be used to unlock or access any devices.

## CONCLUSION

25.    Based on the foregoing information, I respectfully request that the court authorize a search warrant for Subject Device, described in Attachment A to search for and seize items described in Attachment B.